**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ETHAN SILVERMAN and JEFFERY TOMASULO, on behalf of themselves and all others similarly situated, | INDEX NO. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| AMAZON.COM, INC.; HACHETTE BOOK GROUP, INC; HARPERCOLLINS PUBLISHERS L.L.C.; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SIMON & SCHUSTER, INC., | |
| Defendants. | |

Plaintiffs Ethan Silverman and Jeffrey Tomasulo (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, assert the following against Amazon.com, Inc. ("Amazon"), Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers L.L.C. ("HarperCollins"), Macmillan Publishing Group, LLC ("Macmillan"), Penguin Random House LLC ("Penguin"), and Simon & Schuster, Inc. ("Simon & Schuster" and, together with the other publishers, the "Big Five" or the "Publisher Defendants" and, together with Amazon, "Defendants"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## I.   INTRODUCTION

1.     Amazon dominates the market for sales of electronic books ("eBooks") in the United States, accounting for over 80% of sales. Amazon acquired and maintained this dominant position by continuously deploying anticompetitive provisions in its contracts with the Big Five publishers who, together, control the United States market for trade books (defined below).

2.     In each of its contracts with the Big Five, Amazon requires most favored nation ("MFN") provisions and similar provisions that have the intent and effect of prohibiting any other retailer of eBooks, such as Apple Books or Barnes & Noble (together with other such retailers, the "Alternative Platforms"), from differentiating their products from Amazon's— whether by offering lower prices, introducing innovative business models, or developing unique or superior products. These provisions enable Amazon to prevent the Alternative Platforms from capturing any of its market share or otherwise competing, and thus enabling Amazon to maintain and expand its monopoly power.

3.     The MFNs and similar provisions harm consumers in at least three ways. First, the provisions reduce incentives for publishers and Alternative Platforms to offer lower prices.

The Big Five have good reason to offer lower prices on the Alternative Platforms, since doing so might help the Alternative Platforms gain market share and reduce the Big Five's dependence on Amazon. But since the MFNs obligate the Big Five to allow Amazon to offer the same prices, the Alternative Platforms are unable to differentiate themselves on that basis. Absent that possible gain, the Big Five can only lose by lowering prices on the Alternative Platforms. The result is that Plaintiffs and the Class pay higher prices for eBooks purchased on the Alternative Platforms.

4.     Second, the provisions discourage the Big Five from devising or developing innovative (and potentially less expensive) ways to deliver books to consumers—including eBook rentals, bundling eBooks with physical books or book clubs, and partial downloads. The Big Five would have incentives to work with Alternative Platforms on such models, which could potentially reach new groups of customers, while also potentially strengthening the Alternative Platforms and reducing the Big Five's dependence on Amazon. Again, however, the MFNs and similar provisions give Amazon the right to copy any such approach, which once again blocks the possibility of the Alternative Platforms differentiating themselves. Thus, the MFNs and similar provisions eliminate the Big Five's incentives to work with Alternative Platforms to innovate. The result is reduced choice for Plaintiffs and the Class.

5.     Third, Amazon's restrictive conduct discourages publishers and Alternative Platforms from providing unique eBook content—whether in terms of titles that are available exclusively on an Alternative Platform, even temporarily, or in terms of innovative content such as eBooks enhanced by illustrations, animation or interactive features. This, too, raises prices and reduces consumer choice.

6.      The Alternative Platforms' inability to offer lower prices, or to innovate with respect to eBook distribution models or content, suppresses competition by reducing the ability for new entrants to emerge and/or capture market share. Through its use of the MFNs and similar provisions, Amazon has acquired and maintained monopoly power in the market for sales of eBooks in the United States.

7.      Amazon and the publishers' use of MFNs has drawn the attention of the European Commission's Directorate General for Competition (the "DG Comp"), which found that the provisions were anticompetitive. The DG Comp's investigation concluded with Amazon agreeing not to deploy MFNs or similar provisions in Europe for five years. Here in the United States, the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial and Administrative Law (the "House Antitrust Committee") launched an investigation into Amazon along with other dominant tech platforms. Like the DG Comp, the House Antitrust Committee concluded in its October 2020 report that Amazon's use of MFNs was harmful to competition.

8.      Moreover, this is not the Big Five's first rodeo. A decade ago, the Big Five conspired with Apple to raise eBook prices via MFNs. This conduct led to investigations by both federal and state prosecutors, and resulted in consent decrees prohibiting the publishers from using MFNs for a period of five years. Yet in 2015—despite the consent decrees—the Big Five entered into new agreements with Amazon imposing highly restrictive MFNs and/or so-called "notification provisions" ensuring that no Alternative Platform could differentiate itself from, or otherwise compete with, Amazon. On the rare occasion when the Big Five publishers refused to comply, Amazon retaliated against them by crippling their sales on its platform.

9.      Publisher Defendants' anticompetitive use of MFNs and similar provisions materially and proximately cause injury to Plaintiffs and the Class, within the meaning of Section 4 of the Clayton Act, and have caused Plaintiffs and the Class to pay supra-competitive prices for eBooks and reduced their choices as consumers.

10.      Plaintiffs and the Class seek monetary recovery for all overcharges incurred by the Class as defined herein. Further, because Plaintiffs and the Class are threatened with impending future harm in the form of additional overcharges and reduced consumer choice, they seek injunctive, declaratory and other forms of equitable relief within the meaning of Section 16 of the Clayton Act.

## II.      JURISDICTION, VENUE AND INTERSTATE COMMERCE

11.      This action arises, in part, under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiffs and the Class for their damages, including treble damages; and under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain future violations. This Court has jurisdiction over Defendants pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. § 15(a) and 22, and pursuant to 28 U.S.C. §§ 1331.

12.      This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

13.      Plaintiff Ethan Silverman is a resident of New York who purchases eBooks from the Big Five through one or more of Amazon's rival booksellers. Plaintiff Jeffrey Tomasulo is a resident of Connecticut who purchases eBooks from the Big Five through one or more of

Amazon's rival booksellers. Plaintiffs were harmed and injured financially because of Defendants' conduct, as described further herein.

14.     This Court has personal jurisdiction over Defendant Amazon under Section 12 of the Clayton Act, because Amazon regularly does and solicits substantial business in this District, either directly or through intermediaries, is continuously and systematically present in this District, and has established minimum contacts with this District, in particular by registering to do business in the State of New York, maintaining a registered agent for service of process in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in this District.

15.     Amazon resides in this District or may be found or transact business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its Manhattan office space.[1] It has five warehouses in New York, including two in Manhattan.[2] It also owns and operates two Amazon Books stores and eight cashier-free Go-stores in locations throughout Manhattan.[3] Amazon has eight office properties in Manhattan, most of which are clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[4] Amazon was engaged in an illegal, anticompetitive scheme to monopolize the eBooks market that was directed at, and had a direct, substantial, reasonably foreseeable and intended

---

[1] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, N.Y. Times (Dec. 9, 2019), https://www.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[2] *List of Amazon locations*, Wikipedia, https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

[3] *Where are Amazon Go stores located in New York?*, Bing, https://www.bing.com/maps (search "Where are Amazon Go stores located in New York?"); *Where are Amazon Books stores located in New York?*, Bing, https://www.bing.com/maps (search "Where are Amazon Books stores in New York?").

[4] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In.*, N.Y. Times (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-space.html.

effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

16.     This Court has personal jurisdiction over the Publisher Defendants under Section 12 of the Clayton Act, because they regularly do and solicit substantial business in this District, either directly or through intermediaries; are continuously and systematically present in this District; and have established minimum contacts with this District, in particular by registering to do business in the State of New York, maintaining a registered agent for service of process in New York, maintaining offices in New York, and conducting banking with financial institutions in this District.

17.     Exercising personal jurisdiction is also appropriate under Section 302(a) of New York's long-arm statute because Defendants transact business in the State of New York, directly or through agents, such that they have sufficient minimum contacts with New York. As to Amazon, in addition to business it transacts in New York City, Plaintiffs aver on information and belief that Amazon's sales to its customers in New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of substantial solicitation necessary to satisfy the minimum contacts required to support this Court's exercise of personal jurisdiction over Amazon.

18.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the Publisher Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

19.     Defendants' acts as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Defendants facilitate the sale of eBooks across, and without regard to, state lines.

## III.   PARTIES

### A.   Plaintiff

#### 1.   Ethan Silverman

20.     Ethan Silverman is a resident of New York, NY. Since February 11, 2017, he has regularly purchased eBooks from one or more of the Publisher Defendants through an Alternative Platform. In all events he paid the same or more for those eBooks than he would have paid if he had made the purchase through Amazon.

21.     Mr. Silverman also shops on Amazon, but he asserts no claims in this action relating in any way to any products or services sold or distributed through Amazon.

22.     The conspiracy among Amazon and the Big Five prevented competition that would have resulted in lower prices for these eBooks, as well as increased consumer choice. Mr. Silverman has been injured and will continue to be injured by paying more for the Big Five's eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

#### 2.   Jeffery Tomasulo

23.     Jeffery Tomasulo is a resident of Fairfield County, Connecticut. Since February 11, 2017, he has regularly purchased eBooks from one or more of the Publisher Defendants through an Alternative Platform. In all events he paid the same or more for those eBooks than he would have paid if he had made the purchase through Amazon.

24.     Mr. Tomasulo also shops on Amazon, but he asserts no claims in this action relating in any way to any products or services sold or distributed through Amazon.

25.     The conspiracy among Amazon and the Big Five prevented competition that would have resulted in lower prices for these eBooks, as well as increased consumer choice. Mr. Tomasulo has been injured and will continue to be injured by paying more for the Big Five's eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**B.     Defendants**

26.     Amazon is an international conglomerate with its principal headquarters in Seattle, Washington and with facilities and employees throughout the United States, including in this District. Amazon is vertically integrated and is active upstream as a publisher, with its own imprints, and downstream, both via sales of eBooks through its online platforms and through sales of hard copy books in its brick-and-mortar stores. Amazon sells eBooks and offers eBook reading subscription services to its retail customers in New York and throughout the United States from the Amazon platforms.[5] Amazon also operates Amazon Publishing, a division of Amazon that publishes books and competes with the Big Five.

27.     In the U.S. market, Amazon accounts for over half of all print book sales and over 80% of e-book sales.[6]

28.     The Big Five Publisher Defendants are Hachette, HarperCollins, Macmillan, Penguin and Simon & Schuster. The Big Five produce "trade books," a term of art referring to "general interest fiction and non-fiction books," as "distinguished from 'non-trade' books such

---

[5] As used in this Complaint, "Amazon" refers to Amazon's website, Amazon.com; Amazon's software applications for phones, tablets or other devices; or other means of accessing Amazon, its marketplace, and related services.

[6] House Judiciary Committee, *Investigation of Competition in Digital Markets*, Oct. 5, 2020 at 255, https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("House Report"); *see also* Matt Day and Jackie Gu, *The Enormous Numbers Behind Amazon's Market Reach*, Bloomberg (Mar. 27, 2019), https://www.bloomberg.com/graphics/2019-amazon-reach-across-markets/ (estimating that Amazon controls 88.9% of the eBooks market).

as academic textbooks, reference materials, and other texts."[7] Collectively, the Big Five account for about 80% of the trade books sold in the United States.[8]

29.     **Defendant Hachette** is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street. Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

30.     **Defendant HarperCollins** is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With over two hundred years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages, and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins' authors are winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

---

[7] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015)

[8] Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag.com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/.

31.    **Defendant Macmillan** is a leading U.S. trade publisher, having its principal place

of business in New York City, and is qualified to do business and is doing business in the State

of New York and in this District. Macmillan is part of a global trade publishing group operating

worldwide, with trade publishing companies in the United States, Germany, the United

Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the US:

Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company;

Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge. Its

writers, including Jeff VanderMeer, Senator Elizabeth Warren, James Comey, Orson Scott Card,

and Paul Beatty, come from a vast array of literary backgrounds and have won awards including

the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National

Book Award, and the Printz Award.

32.    **Defendant Penguin** is a leading U.S. trade publisher, organized under the laws of

Delaware, having its principal place of business in New York City, and is qualified to do

business and is doing business in the State of New York and in this District. With a rich history

dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275

independent publishing imprints and brands on five continents and contains books and products

for readers of all ages at every stage of life. Penguin publishes 15,000 new titles annually and

sells close to 800 million print, audio, and eBooks annually. Since Penguin acquired Random

House in 2013, the combined company controls as much as 37% of the market for trade books in

the United States.[9] Penguin's many authors include more than 80 Nobel Laureates and hundreds

of the world's most widely read authors.

---

[9] *Id.*

33.     **Defendant Simon & Schuster** is a leading U.S. trade publisher, organized under the laws of New York, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. It publishes 2000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster Children's Publishing and Simon & Schuster Audio, along with international affiliates in Australia, Canada, India and the United Kingdom. Simon & Schuster publishes the works of its authors—which include, among others, Dale Carnegie, Sharon Draper, Jennifer Egan, Joseph Heller, Ernest Hemingway and Stephen King—in more than 200 countries and territories. Its books and authors have won the Pulitzer Prize, National Book Award, National Book Critics Circle Award, Newbery Medal, and Caldecott Medal. On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house controlling approximately 50% of all trade books published.[10]

## IV.     DEFENDANTS' MARKET POWER IN THE RELEVANT MARKETS

34.     The relevant market for purposes of this action is the retail sale of trade eBooks in the United States (the "Relevant Market"). Amazon and the Publisher Defendants have market power in the Relevant Market.

### A.     Relevant Product Market

35.     Trade books represent a distinct product market from non-trade books, such as reference and academic books.[11] They also represent a distinct product market from self-

---

[10] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

[11] *Apple*, 952 F. Supp. 2d at 648 n.4.

published books. Whereas a self-published author fronts all costs and is responsible for the
content and marketing of the title, publishers receive the rights to sell an author's book in
exchange for covering all aspects of editing, publication, marketing, and distribution.[12] Trade
publishers are highly selective. They do not read 95% of the manuscripts they receive and
publish only about 1% of the manuscripts they do review.[13]

      36.     Within the trade book market, there is a distinct product market for eBooks as
opposed to print books or audio books.[14] Courts and economists typically define the boundaries
of a market by reference to products' functional substitutability, and products' physical
characteristics often determine their functional substitutability.[15] In this case, eBooks are digital
products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to
read them. Thus, eBooks do not have a physical presence the way a print book does. EBooks are
also different from audio books, which are made for listening, not visual reading. These
distinguishing characteristics affect the substitutability of print books and audiobooks in the
supply or demand for eBooks.[16]

      37.     On April 5, 2017, the DG Comp concluded its investigation into Amazon's use of
MFNs (*see infra* § V.C), and found that "the substitutability" between eBooks and print books
"is not sufficiently strong to warrant the inclusion of print books in the product market of which

---

[12] Shaunta Grimes, *A Guide to Traditional vs. Self-Publishing*, Medium (Sept. 23, 2019), https://medium.com/the-write-brain/a-guide-to-traditional-vs-self-publishing-6f7c126707b5.

[13] *Odds Of Being Published,* Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published (last visited Feb. 10, 2021).

[14] *Apple*, 952 F. Supp. 2d at 694 n. 60 (defining the relevant market as trade eBooks in the United States); European Commission, DG Comp, Case AT.40153 E-Book MFNs and related matters (Amazon), Commission Decision at ¶ 43 (May 4, 2017), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("DG Comp Decision").

[15] Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 562 (5th Ed.).

[16] DG Comp Decision, *supra* n. 14, ¶ 43.

e-books form a part."[17] As to demand-side substitutability, the DG Comp found that even in the face of a 5-10% increase in price, consumers of eBooks were unlikely to switch to print books, given consumer preferences for the unique functionalities that eBooks offer.[18]

38.     As to supply-side substitutability—*i.e.*, whether distributors of the different products can quickly and easily enter each other's markets—the DG Comp found that eBooks and print books are not substitutes. While the distribution of print books involves "important investments in . . . distribution, ware-housing and logistics," distribution of eBooks "requires mainly setting up and maintenance of an online distribution platform."[19]

39.     The DG Comp likewise concluded that audiobooks are in a separate product market from eBooks.[20]

40.     Because print books and audio books are not reasonable substitutes for eBooks, the relevant product market is the market for eBooks.

## B.     Relevant Geographic Market

41.     The relevant geographic market is the United States. The eBook market operates on a nationwide basis. Much of the sales activity in that market occurs through nationwide channels, including Amazon's online sales platforms and those of the Alternative Platforms.

42.     The Publisher Defendants sell their eBooks throughout the United States.

---

[17] *Id.* at 14.

[18] *Id.* ("(i) [E]-books are easier to carry than print books when travelling, (ii) e-books have additional functionalities compared to print books, such as the possibility to change the type and size of the font; (iii) e-books can support interactive features such as video or music add-ons, dictionaries, links to information about the subject matter of the book or the author, and (iv) e-books can be purchased and downloaded immediately at any time."). The Commission also noted the availability of a wider range of titles in eBook format. *Id.*

[19] *Id.*

[20] *Id.*

43.     EBook retailers located outside of the United States are unable to constrain the pricing of eBooks in the United States.

## C.     Amazon Has Market Power In the Relevant Market

44.     Amazon is far and away the largest provider of eBooks in the United States, with more than 80% of the market.[21]

45.     Market shares as large as Amazon's create an inference of market power.

46.     Amazon's market power is durable because barriers to entry make entry by new competitors difficult.[22] Amazon's Kindle is the centerpiece of a closed ecosystem. The large base of Kindle eReaders that already exists around the world operates as a barrier to entry for other eBook retailers. Further, effective entry into or expansion in the eBook market would require Alternative Platforms to be able to differentiate their products or services, including by offering lower prices, innovative distribution methods or innovative products. Amazon's MFNs and similar provisions make such competition impossible. As the allegations in this complaint make clear, the purpose and effect of Amazon's MFNs and similar provisions is to prevent Alternative Platforms from competing more effectively with Amazon.

## D.     The Big Five Possess Market Power in the Relevant Market

47.     The market in trade books is defined by the trade publishers that produce them. Together, the Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of the New York Times bestsellers.[23] The Big Five Publishers control as much as 80% of the market for trade books.[24]

---

[21] House Report, *supra* n.6, at 255.

[22] DG Comp Decision, *supra* n. 14, ¶ 125 (finding that such barriers exist and exacerbate "the potential foreclosure effect of the Retail Price Parity Provisions," discussed below).

[23] *United States v. Apple, Inc*., 791 F.3d 290, 298 (2d Cir. 2015).

[24] McIlroy, *supra* note 8.

48.     Large publishing companies began to dominate the market in the 1930s and by 1950, it became "concentrated in a relatively few houses."[25] Consolidation reached a fevered pitch in the 1980s. Between November 1985 and November 1986 alone, there were fifty-seven major publishing acquisitions.[26] By 2006, the six largest U.S. trade book publishers (the "Big Six") accounted for 90%of total sales.[27] In 2013, the Big Six became the Big Five after Penguin merged with Random House, producing a conglomerate that now controls approximately 37% of the market for trade books in the United States.[28] The Big Five will become the Big Four when Penguin Random House completes its acquisition of Simon & Schuster to create a publisher that controls 50% of the U.S. trade book market.[29]

49.     Fewer and fewer trade publishers can compete with the Big Five. Houghton Mifflin Harcourt recently announced that it, too, was exploring a sale of its trade publishing division, potentially with Macmillan or Hachette.[30]

## V.      FACTUAL BACKGROUND

### A.      The Big Five's Conspiracy with Apple

50.     As discussed in greater detail below, this Complaint alleges that the Big Five conspired with Amazon to use MFNs to raise eBook prices. Indeed, this is not the first time they have done so. A decade ago, the Big Five entered a similar conspiracy to raise prices in the same market at issue in this case—but in that instance, the eBook retailer was not Amazon, but Apple.

---

[25] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1259-1263 (May 2019) (further citation omitted).

[26] *Id.*

[27] *Id.*

[28] McIlroy, *supra* note 8.

[29] Maher, *supra* note 10.

[30] Alexandra Alter & Edmund Lee, *Penguin Random House to Buy Simon & Schuster,* N.Y. Times (Nov. 25, 2020), https://www.nytimes.com/2020/11/25/books/simon-schuster-penguin-random-house.html.

51.     In 2009, just two years after launching its Kindle eReader, Amazon controlled

90% of the market for eBooks.[31] Amazon gained market share in part by charging just $9.99 for

many new releases and bestsellers.[32] The Big Five (they were a "Big Six" at the time) resented

Amazon's sale of their titles at such a low price, which was close to or even *lower* than the

wholesale price at which they provided those titles to Amazon.[33] The publishers also feared

Amazon's growing power and, in particular, that consumers would come to expect that print

books, too, should sell for something close to the $9.99 Kindle price—far below the $20, $25 or

$30 that they typically commanded.[34] Each of the Big Five expressed its frustration to Amazon

about the $9.99 price point. In early December 2009, for instance, Hachette told Amazon that its

$9.99 pricing posed a "big problem" for the industry, but that an increase of even one or two

dollars would "solve the problem."[35]

52.     After Amazon refused their entreaties, the publishers recognized the importance

of coordinating their efforts to raise prices. One publisher's internal memo stated that, "the

industry needs to develop a common strategy."[36] The publishers had regular opportunities to

conspire, as the senior executives for each of the publishers meet on a quarterly basis without

lawyers present.[37] At the bench trial against Apple, the publishers' CEOs testified that they "did

---

[31] *Apple*, 791 F.3d at 299.

[32] *Id.*

[33] *Id.* (quoting an Amazon executive describing this price as part of a "classic loss-leading strategy").

[34] *Id.*

[35] *United States v. Apple Inc.*, 952 F. Supp. 2d at 650 (quoting Hachette as saying that the publishers had to prevent Amazon's "wretched $9.99 price point becoming a de facto standard"; Simon & Schuster describing Amazon's pricing as the "basic problem," "a mistake" and "terrible for the business"; Macmillan referring to Amazon's price policy as "book devaluation to $9.99" and indicating that "all the pubs" were talking about it; Penguin telling Amazon that "their 9.99 model" was "not a good sustainable one"; and HarperCollins telling Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers").

[36] *Apple*, 791 F.3d at 300.

[37] *Apple*, 952 F. Supp. 2d at 651.

not compete with each other on price" and thus "felt no hesitation in freely discussing Amazon's prices with each other and their joint strategies for raising those prices."[38] The court found that "[w]hile no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could."[39]

53.     Meanwhile, Apple was preparing to launch its new tablet, the iPad, and was eager to establish a beachhead of its own in eBook publishing.[40] Beginning in December 2009, Apple set up meetings with each of the Big Five, making it clear that it would be meeting with all of them.[41] Apple offered to raise the price of eBooks above $9.99.[42] In exchange, Apple demanded that the Big Five switch from a wholesale to agency model for book sales, whereby the publishers would set the prices and sell the books, but keep only 70% of the proceeds of the sale, leaving Apple a 30% commission for hosting the sale.[43]

54.     Crucially, under the agency model, the sales transaction occurs directly between the publisher and the retail consumer.[44] The agency model does not permit the retailer-agent to discount the price unilaterally.[45]

---

[38] *Id.* (paraphrasing the witnesses' testimony).

[39] *Id.* at 665.

[40] *Id.* at 654-55.

[41] *Id.*

[42] *Id.* at 658-62.

[43] *Apple*, 791 F.3d at 303 ("Unlike a wholesale model, in an agency relationship the publisher sets the price that consumers will pay for each ebook. Then, rather than the retailer paying the publisher for each ebook that it sells, the publisher pays the retailer a fixed percentage of each sale. In essence, the retailer receives a commission for distributing the publisher's ebooks.").

[44] Constance Grady, *The 2010s were supposed to bring the ebook revolution*, Vox (Dec. 23, 2019), https://www.vox.com/culture/2019/12/23/20991659/ebook-amazon-kindle-ereader-department-of-justice-publishing-lawsuit-apple-ipad; DG Comp Decision, *supra* n. 14, at 8.

[45] Sarah Boyle, *What Is the Agency Model for Ebooks? Your Burning Questions Answered*, Publishing Trendsetter (May 1, 2012), http://publishingtrendsetter.com/industryinsight/simple-explanation-agency-model/.

55.     The Big Five stood to make less money on each sale than they would under the wholesale model, but agreeing to Apple's proposal would accomplish their overarching long-term goal: retaking control of pricing back from the eBook retailers.[46]

56.     There was one problem: Apple knew that "[t]o ensure that the iBookstore would be competitive at higher prices, Apple . . . needed to eliminate all retail price competition."[47] Apple told the publishers that "to sell ebooks at realistic prices . . . all [other] resellers of new titles need to be in [the] agency model" as well.[48]

57.     Initially, Apple sought to accomplish this by simply demanding that each publisher require every other eBook retailer adopt an agency model. Then Apple settled on "an elegant alternative": MFN clauses.[49]

58.     As the Second Circuit summarized the ploy: "The MFN Clause changed the situation by making it imperative, not merely desirable, that the publishers wrest control over pricing from eBook retailers generally. Under the MFN, if Amazon stayed at a wholesale model and continued to sell ebooks at $9.99, the publishers would be forced to sell in [Apple's] iBookstore, too, at that same $9.99 price point."[50] Because the publishers were making only 70% on those sales, "[t]he result would be the worst of both worlds: lower short-term revenue and no

---

[46] *Apple*, 791 F.3d at 305 ("Under Apple's initial agency model—with price caps but no MFN Clause—the publishers already stood to make less money per ebook with Apple. Because Apple capped the ebook price of a $25 hardcover at $12.99 and took 30% of that price, publishers could only expect to make $8.75 per sale. But what the publishers sacrificed in short-term revenue, they hoped to gain in long-term stability by acquiring more control over pricing and, accordingly, the ability to protect their hardcover sales.")

[47] *Id.* at 303 (quoting decision below).

[48] *Id.* at 303-04.

[49] *Id.* at 304, 317.

[50] *Id.* at 305.

control over pricing. The publishers recognized that, as a practical matter, this meant that the

MFN Clause would force them to move Amazon to an agency relationship."[51]

59.    The publishers cooperated on the condition that all of the other publishers

followed suit. One publisher informed Apple "that he would join [Apple's] iBookstore only if

four other publishers agreed to participate."[52]

60.    In sum, Apple and the publishers used MFNs to execute their plan to raise eBook

prices market wide. As the Second Circuit explained, "[b]y the very act of signing a Contract

with Apple containing an MFN Clause, then, each of the Publisher Defendants signaled a clear

commitment to move against Amazon, thereby facilitating their collective action."[53] Indeed, the

MFN operated not only as the mechanism to make sure that no eBook retailer could underprice

Apple, but also as the mechanism to ensure participation by all of the publishers: "Apple was

fully aware that its proposed Contracts would entice a critical mass of publishers only if these

publishers perceived an opportunity collectively to shift Amazon to agency. In fact, this was the

very purpose of the MFN."[54] The Second Circuit added, "[t]he MFNs in Apple's Contracts

created a set of economic incentives pursuant to which the Contracts were only attractive to the

Publisher Defendants to the extent they acted collectively."[55]

61.    After agreeing to Apple's agency model and MFN provisions, the publishers

asked Amazon to switch from a wholesale to an agency model, too. At first, Amazon resisted.

However, the Big Five threatened to withhold their eBooks until seven months after releasing the

---

[51] *Id.*

[52] *Id.* at 307.

[53] *Id.* at 317.

[54] *Id.*

[55] *Id.* at 320.

titles in print.[56] After an unsuccessful attempt at retaliation, which temporarily devalued
Amazon's stock, Amazon acceded to the Big Five's demands.[57] By March 2010, Amazon had
completed agency agreements with four of the Big Five publishers, with the fifth to follow three
months later. Each agreement included a "model parity" clause. This gave Amazon the option to
return to a wholesale model of distribution if the publisher agreed to a wholesale distribution
arrangement with any other eBook retailer.[58]

62.     When Apple's iBookstore opened in April 2010, the conspiracy went into effect,
resulting in a sudden and uniform price increase, as the following graph indicates.[59] EBook
prices soared for the four publishers that finalized their agency agreements in March—note the
jump in prices following the dark vertical line around March 2010. Penguin's price increases
followed shortly after it executed its agreement with Apple in June—note the jump in prices for
the tan-colored horizontal line following the gray vertical line around June 2010.[60]

---

[56] *Apple*, 694 F. Supp. 2d at 679-80.

[57] *Id.* at 680-81.

[58] *Id.* at 681.

[59] *Id.* at 683; *see* Joel Hruska, *Appeals upholds $450 million fine against Apple for fixing ebook prices*, ExtremeTech (July 1, 2015), https://www.extremetech.com/computing/209142-appeals-upholds-450-million-fine-against-apple-for-fixing-ebook-prices. The flat line near the bottom of the chart represents the average prices of non-major publishers, who did not join the conspiracy. Random House, then separate from Defendant Penguin, also did not join in the conspiracy and its average prices remained around $8. When it later adopted an agency model, it raised its prices, too. *Apple,* 694 F. Supp. 2d at 685.

[60] *Id.* at 683.



63.     In the short term, the plan paid off for Apple and the Big Five. Apple seized 22%

of the eBooks market in the first two months of operation.[61] While the Big Five lost revenue

under the agency model, they offset their losses in eBooks by raising prices for hardcover

books.[62]

64.     However, it was not long before Apple and the Big Five faced the legal

consequences of their collusion. In December 2011, they faced a class action in this District.[63]

The DOJ and Attorneys General (AGs) from 33 states followed with their own lawsuit in this

District in early 2012.[64] Lastly, Europe's DG Comp opened an investigation.[65]

65.     Rather than proceed to trial, the publishers agreed to consent decrees with the

DOJ.[66] The consent decrees precluded the publishers from engaging in six categories of

---

[61] Marco Tabini, *Apple grabs 22 percent of eBook market with iBooks*, Macworld (June 7, 2010), https://www.macworld.com/article/1151813/ibooks.html.

[62] *Apple*, 952 F. Supp. 2d at 683.

[63] *In re Electronic Books Antitrust Litig.*, 1:11-md-02293 (S.D.N.Y.).

[64] House Report, *supra* n.6, at 333; DG Comp Decision, *supra* n. 14, at 8.

[65] DG Comp Decision, *supra* n. 14, ¶ 19 (recounting the prior investigation).

[66] *Apple*, 791 F.3d at 311-12.

prohibited conduct.[67] Among other things, the decrees shifted pricing authority from the publishers back to the retailers by requiring that, *for two years*, publishers must permit eBook retailers to add their own discounts to the retail prices of the Big Five's eBooks sold through the retailer's platform.[68] *For five years*, publishers were prohibited: from entering any agreement with an eBook retailer containing a "Price MFN," defined to include agency parity provisions, promotion parity provisions, wholesale parity provisions, and commission parity provisions (described more fully below); from retaliating against an eBook publisher for setting its own prices; and from initiating a new conspiracy to fix prices.[69] The Big Five also reached settlements with DG Comp on December 12, 2012, and July 25, 2013, which banned retail price clauses, wholesale price clauses and commission parity clauses for five years, as well as requiring a two-year "cooling-off" period during which the publishers were required to allow discounting by eBook retailers.[70]

66.    Unlike the publishers, Apple proceeded to a bench trial in this District. The court found that Apple and the publishers had engaged in a *per se* illegal horizontal price fixing agreement, which had the intent and effect of eliminating price competition in the eBook market and increasing the retail price of eBooks.[71]

---

[67] *See, e.g.*, *United States v. Apple, Inc.*, No. 1:12-cv-2826, ECF No. 259 (S.D.N.Y. May 17, 2013) ("Penguin Final Judgment"); *id.* ECF No. 119 (S.D.N.Y. Sept. 6, 2012) (Hachette, HarperCollins and Simon Schuster Final Judgment); *id.* ECF No. 354 (S.D.N.Y. Aug. 12, 2013) (MacMillan Final Judgment).

[68] DG Comp Decision, *supra* n. 14, at 8; *see, e.g.*, Penguin Final Judgment ¶V.A ("For two years, [each Big Five publisher] shall not restrict, limit, or impede an E-book Retailer's ability to set, alter or reduce the Retail Price of any E-book or to offer price discounts or any other form of promotions.").

[69] Penguin Final Judgment ¶ II.N (defining a "Price MFN" as a contract term linking a retail price on one eBook retailer to the price on another eBook retailer, linking a wholesale price to one eBook retailer to the wholesale price to another eBook retailer, or linking the commission one eBook retailer receives to the commission another eBook retailer receives); ¶ V.C ("Penguin shall not enter into any agreement with an E-book Retailer relating to the Sale of E-books that contains a Price MFN."); ¶ XI (providing that, unless otherwise indicated, the Final Judgment expires after five years).

[70] DG Comp Decision, *supra* n. 14, at 8.

[71] *Apple*, 952 F. Supp. 2d at 694.

67.     Before proceeding to trial on damages, the Court entered an injunction that, among other things, "prevent[ed] Apple from enforcing MFNs with eBook publishers, retaliating against publishers for signing agreements with other retailers, or agreeing with any of the Publisher Defendants to restrict, limit, or impede Apple's ability to set eBook retail prices."[72] The court ultimately settled the private action for $450 million.[73]

## B.     The Big Five's Agency Agreements with Amazon

68.     Astonishingly, right after they were sanctioned for coordinating with Apple to use agency pricing and MFNs to raise eBook pricing, the Big Five publishers immediately embarked on a similar conspiracy with Amazon.

69.     The consent decree terms that prohibited the Big Five from agreeing to Price MFNs or conspiring with each other to raise eBook prices remained in place until 2017 or 2018 (depending on the publisher). But the terms that prohibited the Big Five from entering into agency agreements with eBook retailers expired in 2015. As soon as they did, the Big Five promptly reintroduced the agency model by renegotiating their agreements with Amazon, thus reclaiming the right to set prices.[74]

70.     The same individuals were involved in both sets of agreements. Five top executives from the Big Five were pivotal to the conspiracy with Apple: David Shanks, CEO of

---

[72] *Apple*, 791 F.3d at 313.

[73] Matt Chiappardi, *2nd Circ. Nixes Challenge To $450M Apple E-Book Settlement*, Law360 (Feb. 17, 2016), https://www.law360.com/articles/760022/2nd-circ-nixes-challenge-to-450m-apple-e-book-settlement.

[74] Jeffrey A. Trachtenberg, *E-Book Sales Fall After New Amazon Contracts*, Wall Street Journal (Sept. 3, 2015 https://www.wsj.com/articles/e-book-sales-weaken-amid-higher-prices-1441307826; see also Grady, *supra* note 44; *For the Big Five, Agency Now Holds Sway Across the Board*, Author's Guild (Sept. 9, 2015), https://www.authorsguild.org/industry-advocacy/for-the-big-five-agency-now-holds-sway-across-the-board/; *Amazon, HarperCollins reach multi-year publishing deal*, First Post (Apr. 14, 2015), https://www.firstpost.com/tech/news-analysis/amazon-harpercollins-reach-multi-year-publishing-deal-report-3666709.html; Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

Penguin; Carolyn Reidy ("Reidy"), President and CEO of Simon & Schuster; Brian Murray

("Murray"), CEO of HarperCollins; John Sargent ("Sargent"), CEO of Macmillan; and David

Young ("Young"), Chairman and CEO of Hachette.[75] In 2015, at the time the Big Five entered

new agency agreements with Amazon, three of those five executives were still leading their

companies.[76]

71.    The agreements between Amazon and each of the Big Five had anticompetitive

effects on the Relevant Market, including higher prices and lower output. Amazon claimed that

the new agreements gave publishers incentives to set prices low, yet the Wall Street Journal

reported that the deals led to *higher* prices for the Big Five's eBooks, and those higher prices hurt

sales: "some publishing executives say higher e-book prices, resulting from the Amazon deals,

are discouraging purchases."[77]

72.    According to Nielsen Book (now known as NPD BookScan), a company that

measures books sales, "the return of agency pricing by the Big Five trade houses in 2015 raised

e-book prices by an average of $3, leveling off at about $8 per book. *That jump in prices*

*coincided with the downturn in e-book sales for traditional publishers*. And while *e-book prices*

*for the Big Five were rising*, prices for self-published books were settling in at about $3."[78]

---

[75] *Apple*, 952 F. Supp. 2d at 655-60.

[76] Paul St. John Mackintosh, *E-book Sales and Writers Be Damned! Simon & Schuster CEO Carolyn Reidy Loves the New Status Quo Created by Big Publishing,* Teleread (Sept. 30, 2015), https://teleread.com/big-publishing-assimilates-digital-print/index.html (indicating that Reidy was CEO of Simon & Schuster in 2015); *Leadership Team*, Harper Collins Publishers, https://www.harpercollins.com/pages/worldwide-leadership-team (last visited Feb. 11, 2021) (indicating that Murray has been CEO of Harper Collins since 2008); Sarah Weinman, *People: Weisberg Named President of Macmillan Publishers US*, Publishers Lunch (Nov. 19, 2015), https://lunch.publishersmarketplace.com/2015/11/people-weisberg-named-president-of-macmillan-publishers/ (noting that Sargent was CEO of Macmillan in 2015).

[77] Trachtenberg, *supra* note 74.

[78] Jim Milliot, *The Bad News About E-books*, Publishers Weekly (Jan. 20, 2017), https://www.publishersweekly.com/pw/by-topic/digital/retailing/article/72563-the-bad-news-about-e-books.html (emphasis added).

73.     Another market observer, writing in 2018 about a drop in eBook sales, remarked that "[t]he primary reason for this is due to *Amazon not being able to set the digital price anymore, the publishers are doing that*. This has led to an average increase of $5.00 per title and many people find that paying $15.00 to $22 for a Kindle book, is too expensive."[79]

74.     Crucially, the agreements between Amazon and each of the Big Five publishers did more than simply return to an agency model. They also deployed MFNs and/or similar provisions that enabled the Big Five to set prices, but ensured that prices would increase.

75.     As the largest retailer of both print books and eBooks, the bargaining power that Amazon wields over the Publisher Defendants is immense. In negotiating its agency agreements, Amazon could have retained its right to discount their eBooks. Instead, it agreed to let the Publisher Defendants set their own inflated prices in exchange for high commissions and the publishers' guarantee that no other eBook retailer could offer their eBooks at a lower price or better terms, or introduce innovative business models or content.

## C.     Investigations into Amazon and the Big Five's Anticompetitive Use of MFNs

76.     In June 2015, the DG Comp launched an investigation into the use of MFN and similar provisions in the agreements between Amazon and the Big Five.[80] The DG Comp found that these provisions in the Big Five contracts had probable anticompetitive effects, including higher prices and reduced choice for consumers.[81] The MFNs and similar provisions have also

---

[79] Michael Kozlowski, *Are ebooks too expensive in 2018?*, GoodEReader (May 14, 2018), https://goodereader.com/blog/e-book-news/are-ebooks-too-expensive-in-2018.

[80] DG Comp Decision, *supra* n. 14, at 4-5.

[81] *See, e.g., id.* ¶ 89 (". . . Amazon's Business Model Parity Clause is capable of reducing, or likely to reduce, the competitiveness of E-book Retailers [i.e., Alternative Platforms] by limiting their scope to differentiate on the basis of alternative business models."); ¶ 104 (". . . the Selective Parity Clauses are capable of weakening, or are likely to weaken, competition and are capable of deterring, or are likely to deter entry and/or expansion of E-book Retailers by limiting E-book Retailers' scope for differentiating their e-book offerings across different E-book Retailers. Reduced competition at the e-book distribution level may result in higher prices and less choice for consumers."); ¶ 113 ("...Amazon's Selection Parity Clauses potentially strengthen its potentially dominant position. . ."); ¶ 114 (". . . reduced competition between E-book Retailers may in itself be capable of resulting in further harm to

enabled Amazon to acquire and maintain monopoly power.[82] In 2017, at the conclusion of the DG Comp's investigation, Amazon offered voluntary commitments to reform its conduct, which were "intended to ensure that no Business Model Parity, Agency Commission Parity, Agency Price Parity, Features Parity, Promotions Parity, Selection Parity, Wholesale Price Parity, or Notification Provision is included or enforced in eBook Agreements between Amazon and [any publisher] for the Sale of eBooks to consumers" in Europe.[83] The restrictions remain in effect for five years.[84] Commissioner Margrethe Vestager said that Amazon's consent to withdrawing its MFNs will "open the way for publishers and [booksellers] to develop innovative services for eBooks, increasing choice and competition to the benefit of European consumers."[85]

77.     Recent government investigations in the United States strongly support the inference that Amazon engages in the same conduct here for which it was sanctioned in Europe.

78.     As noted above, the House Antitrust Committee began investigating Amazon in 2019 as part of a broad investigation into competition in digital markets.[86] As part of that investigation, the Committee requested documents and information on Amazon's market share

---

competition in the form of higher prices and reduced choice."); ¶131 (". . . Amazon's Retail Price Parity Provisions are capable of leading, or likely to lead, to higher rates of commission charged to E-book Suppliers [i.e., publishers]. Those higher rates of commission are, in turn, likely to be passed on to consumers in the form of higher e-book prices."); ¶ 139 (". . . the Retail Price Notification Provision and the Promotion Notification Provision and Amazon's policy to request parity result in anti-competitive effects which are very similar to those of the Retail Price Parity Provisions . . .").

[82] *See, e.g.*, *id.* ¶ 90 ("The Business Model Parity Clause could effectively reinforce barriers to entry and expansion and also prevent consumers from enjoying alternative sources from which to supply their e-books. This could result in higher market shares and more market power for Amazon.").

[83] European Commission, DG Comp, Case AT.40153 E-Book MFNs and related matters (Amazon), Final Commitments (Mar. 29, 2017), 1,
https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4393_3.pdf.

[84] *Id.* at 5.

[85] European Commission Press Release IP/17/1223, Antitrust: Commission accepts commitments from Amazon on e-books (May 4, 2017), https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1223.

[86] House Report, *supra* n.6, at 6.

and its competitors in numerous submarkets of the U.S. retail and ecommerce markets.[87] At one

of the hearings in late July 2020, Amazon CEO Jeff Bezos testified in person at a hearing entitled

"Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple,

Facebook, and Google," where the Committee raised concerns about Amazon's market power

and whether it acquires an unfair advantage over third-party merchants when it competes with

them to sell similar products on its own platform. In a written statement, the presiding Chair

expressed concern that Amazon's dominance in "online marketplace sales" presents a risk that a

single action by that company could "affect hundreds of millions of us in profound and lasting

ways."[88]

79.     On October 6, 2020, after a 16-month investigation, the Judiciary Committee

issued a 450-page long omnibus report, titled "Investigation of Competition in Digital

Markets."[89] The report, which also investigated the marketplace dominance of other large tech

companies, relied on 1,287,997 documents and communications; testimony from 38 witnesses; a

hearing record that spans more than 1,800 pages; 38 submissions from 60 antitrust experts from

across the political spectrum; and interviews with more than 240 market participants, former

employees of the investigated platforms, and other individuals totaling thousands of hours.[90]

Notably, the companies withheld critical "documents that were produced to antitrust authorities

---

[87] Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos, Amazon CEO (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.

[88] House Judiciary Committee Press Release, *Antitrust Subcommittee Chair Cicilline Statement for Hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google"* (July 29, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199.

[89] House Judiciary Committee Press Release, *Judiciary Antitrust Subcommittee Investigation Reveals Digital Economy Highly Concentrated, Impacted By Monopoly Power* (Oct. 6, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3429.

[90] House Report, *supra* n.6, at 8.

in ongoing investigations, or that related to the subject matter of these ongoing investigations," despite the Committee's objection.[91]

80.     As memorialized in its report, the Committee concluded that Amazon "serves as a gatekeeper over a key channel of distribution," the U.S. online retail market, and that by controlling access to the online retail market, it wields tremendous power. [92] Like the other dominant platforms, Amazon abuses that power "by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on" it.[93] It also "uses its gatekeeper position to maintain its market power and "to further entrench and expand" its dominance.[94] The Committee compared Amazon's monopoly power and abuse of that power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[95]

81.     Among its findings, the Committee called out Amazon for its "history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[96] Although Amazon sometimes disguises its MFNs by calling them something else, the effect is the same. For instance, since 2019 Amazon has implemented a "Fair Pricing Policy," but the Committee found that this policy was only a "thinly-veiled MFN restriction" that "has the same effect of blocking sellers from offering lower prices to consumers on other retail sites."[97]

---

[91] *Id.*

[92] *Id.* at 6, 15, 86.

[93] *Id.* at 6.

[94] *Id.*

[95] *Id.*

[96] *Id.* at 295.

[97] *Id.* at 296.

The Fair Pricing Policy "is anticompetitive in that it blocks competition from other marketplaces, and does not result in lower prices for consumers as Amazon has claimed."[98] Amazon retaliates against any perceived violations by suspending sellers' accounts or removing a seller's ability to "win the Buy Box," a key aspect of sales on the platform.[99]

82.     Although Amazon abuses MFN and similar provisions across the many markets it controls, the Committee found that "[t]he anticompetitive effects of Amazon's use of MFN clauses are *particularly pronounced in the book market*."[100] One publisher offered testimony that "the MFN provisions prevent publishers from partnering with any of Amazon's competitors and reinforces Amazon's 'stranglehold' and 'control' over book distribution."[101]

83.     Because of Amazon's market power in the Relevant Market, these contractual requirements prevent Amazon's actual and potential rivals from offering lower prices or promotions, introducing different business models, or developing innovative products.[102] One competitor told the Committee that the effect of Amazon's MFN and related provisions is that publishers "raise the price on competitor sites to match Amazon's price."[103] In other words, Amazon uses the MFN and related provisions to raise prices not only on its own platform, but also on platforms that it does not control.

84.     The Association of American Publishers (AAP), the Authors Guild and the American Booksellers Association (ABA), wrote to the Committee to complain that Amazon "has required suppliers to agree to most-favored-nation provisions (MFNs) that stifle the

---

[98] *Id.*

[99] *Id.*

[100] *Id.* at 295 (emphasis added).

[101] *Id.*

[102] *Id.* at 295-96.

[103] *Id.* at 296.

emergence and growth of competitive alternatives in the book distribution marketplace."[104]  The Committee found that "Amazon's dominance in e-books and its anticompetitive application of price parity clauses to its business relationships in this market 'eliminate[s] the ability of rivals or new entrants to gain any meaningful competitive advantage relative to Amazon.'"[105]

85.     The AAP, Authors Guild and ABA asked Congress to prohibit some of Amazon's worst anticompetitive conduct, including: leveraging the data it gleans from consumers across its entire platform to outcompete merchants, like publishers, that do business on the platform; tying distribution services to advertising services; and abusing loss-leading pricing.[106] Of particular relevance for the purposes of this complaint, the AAP, Authors Guild and ABA specifically recommended that Congress take action or deploy regulations to prohibit Amazon's use of MFNs and other parity provisions.[107]

86.     The Attorney General of Connecticut has launched an investigation into Amazon's use of MFNs in the eBook market.[108] Broader investigations into Amazon's practices by the Federal Trade Commission and the attorneys general of California, Washington, and New York remain ongoing.[109]

---

[104] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, and Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Antitrust Subcomm., 2 (Aug. 17, 2020), https://publishers.org/wp-content/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf ("AAP letter").

[105] House Report, *supra* n.6, at 296 (quoting AAP letter).

[106] AAP letter at 2-3.

[107] *Id.* at 3.

[108] David McCabe, *Connecticut is investigating Amazon's practices in the e-books market*, N.Y. Times (Jan. 13, 2021), https://www.nytimes.com/2021/01/13/technology/connecticut-investigation-amazon-ebooks-antitrust.html.

[109] House Report, *supra* n.6, at 253; Fed. Trade Comm'n Press Release, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

D.      **Amazon's MFNs and Their Terms**

87.    The MFN provisions in Amazon's agreements with the Big Five not only increase prices; they also reduce consumer choice.

88.    Amazon's dominance of the Relevant Market imposes switching costs on any consumer considering purchasing an eBook from an Alternative Platform—for instance, if that consumer owns a Kindle and is thus trapped within Amazon's closed Kindle ecosystem. In order to overcome those switching costs and grab market share away from Amazon, any competitor would need to differentiate its product.[110] There are several ways to do so, including by offering: lower prices; exclusive offerings, even temporarily; innovative business models; or unique content.[111]

89.    Amazon uses MFNs or similar provisions to methodically shut down every one of these avenues to competition.[112]

90.    The MFNs and similar provisions in the agency agreements Amazon has had with the Big Five since at least 2015 fall roughly into four categories: Notification Provisions, Retail Price Parity Provisions, Business Model Parity Provisions, and Selection Parity Provisions.

1.      **Notification Provisions**

91.    As described above, the U.S. federal and state investigations into collusion among Apple and the Big Five publishers resulted in consent decrees that prohibited the Big Five from

---

[110] *See, e.g.*, DG Comp Decision, *supra* n. 14, ¶112 ("Buying e-books outside of Amazon's closed Kindle ecosystem may effectively impose a substantial burden ('switching costs') on the users of Amazon's Kindle e-reader. Therefore, to induce potential customers to switch away from Amazon, competing E-book Retailers need to provide additional value to consumers, for example in the form of differentiated content or early releases of e-books.").

[111] Because Amazon and the Publisher Defendants have not made the terms of their agreements public, Plaintiffs rely on public disclosures, including news reports, submissions to the House Judiciary Committee and the findings of investigations, both by that committee and by the DG Comp, which describe those agreements and their terms.

[112] *See* DG Comp Decision, *supra* n. 14, ¶ 150 (". . . Amazon's Parity Clauses cover practically all the potential avenues a competing E-book Retailer may attempt to use in order to differentiate itself against Amazon. . . .").

entering agreements containing "Price MFNs" with any eBook retailer until 2017 at the earliest. *See supra* § V.A.

92.     Beginning in 2015, however, Amazon and the Big Five circumvented those prohibitions. Rather than explicitly requiring the Big Five to provide Amazon the same prices or other terms that they provide to Alternative Platforms, Amazon implemented "Notification Provisions" that require the Publisher Defendants simply to *notify* Amazon of any such difference.

93.     In place of price parity provisions (discussed below), Amazon and the Big Five agreed to **retail price notification provisions**. Such provisions require publishers to notify Amazon if any Alternative Platform is offering a price lower than Amazon's for any given product.[113]

94.     In place of promotion price parity provisions (discussed below), Amazon and the Big Five agreed to **promotion price notification provisions**. Such provisions require publishers to notify Amazon if any Alternative Platform is offering a promotion that lowers the price of an item below the level on Amazon.[114]

95.     In place of commission parity provisions (discussed below), Amazon and the Big Five agreed to **agency commission notification provisions**.[115] Such provisions require publishers to notify Amazon if any Alternative Platform is receiving a commission rate higher than Amazon's.

---

[113] DG Comp Decision, *supra* n. 14, ¶ 137. Amazon and the Big Five also implement similar provisions for wholesale pricing. *Id.* ¶ 33.

[114] *Id.* ¶ 137.

[115] *Id.* ¶ 33.

96.     Once a publisher notifies Amazon pursuant to one of these provisions, Amazon typically "requests" that the publisher offer Amazon the same retail price, the same promotion, or the same commission.[116] If the publisher does not comply, Amazon retaliates or threatens to retaliate in one of several ways: by removing the buy button or pre-order button for one or more of the publisher's eBooks; by excluding the publisher's eBooks from all promotional activity; or by prominently displaying banners for competing eBooks.[117] Given Amazon's control of 80% of the market for eBooks, any such step could have a catastrophic impact on a publisher's sales.

97.     As a result, and as the DG Comp explained, Amazon's Notification Provisions "result in anti-competitive effects which are very similar to those of the Retail Price Parity Provisions" that the consent decrees had ostensibly prohibited.[118]

98.     The Notification Provisions are anticompetitive because they have the effect and intent of reducing the likelihood that Alternative Platforms' will offer lower prices. The DG Comp cited "several instances where proposed promotions offered by E-book Retailers competing with Amazon were turned down by E-book Suppliers [i.e., Publishers] because of the concern that such promotions would have to be notified to Amazon. E-book Suppliers are discouraged from offering lower prices or better terms to any of Amazon's competitors or new entrants because doing so would require them either to refuse to apply the same prices on Amazon and risk retaliation from Amazon, or to give up the same amount of margin to Amazon, which in light of Amazon's size would represent a significant cost to them."[119] The DG Comp even found that

---

[116] *Id.* ¶ 137.

[117] *Id.* at 36 n.55.

[118] *Id.* ¶ 139.

[119] *Id.* ¶142.

Amazon increased its market share in regions where Notification Provisions were in place as compared to regions where they were not.[120]

99.     Beginning in 2017 or 2018 (depending on the publisher)f, the consent decrees no longer prohibited the Big Five from entering agreements containing Price MFNs. On information and belief, at that point Amazon and the Big Five agreed to some or all of the other MFN provisions discussed herein, which provide a more direct way for Amazon to quash competition from Alternative Platforms.[121]

### 2.     Retail Price Parity Provisions

100.     One way that an Alternative Platform may differentiate itself from Amazon is by offering lower prices. Yet, Amazon deploys at least four different types of price-related contract provisions, known generally as "Retail Price Parity Provisions," that have the intent and effect of eliminating price competition for eBooks.

101.     First, the **agency price parity provision** requires publishers to set the price for a given eBook no higher on Amazon than on an Alternative Platform.[122] Where such a provision is in place, Amazon is assured that no competitor can undersell its price for a given eBook.

102.     Second, the **promotion price parity** provision requires publishers to allow Amazon to match any promotional price at which a publisher's eBook is available on an Alternative Platform.[123]

---

[120] *Id.* ¶144.

[121] *See* House Report, *supra* n.6, at 295 ("Although Amazon has changed the name and specific mechanisms over the years, it appears that the company continues to impose contract provisions that effectively function as MFNs on book publishers.").

[122] DG Comp Decision, *supra* n. 14, at 30 n. 48.

[123] *Id.* ¶ 29.

103.    Third, the **discount pool provision** entitles Amazon to accumulate credits if a publisher offers an eBook on an Alternative Platform for a price lower than the price on Amazon, multiplied by the number of units sold on Amazon.[124] Amazon can then apply those credits in such a way to replicate the effect of an agency price parity provision.[125]

104.    Fourth, an **agency commission parity provision** requires publishers to guarantee Amazon a commission that is equal to or greater than the commission paid to Alternative Platforms.[126] Amazon charges high commissions and other costs to publishers, including the Big Five, which in turn significantly increases the retail price of the eBooks they sell via Amazon.[127]

105.    Taken alone or together, these provisions prohibit the Alternative Platforms from competing with Amazon in the most straightforward way: on price. If these provisions did not exist, an Alternative Platform might accept a lower commission from a publisher and then lower the price it charges to consumers, either permanently or as part of a promotion. However, because these provisions prohibit Alternative Platforms from underselling Amazon, they have nothing to gain by agreeing to a lower commission rate. As the DG Comp explained, "by preventing E-book Suppliers [i.e., Publishers] from making available to competing E-book Retailers lower prices (compared to those on Amazon), Amazon prevents competing E-book Retailers from being able to offer customers advantages which would induce them to overcome the costs associated with switching away from Amazon."[128]

---

[124] *Id.* ¶ 133.

[125] *Id.* ¶ 135.

[126] *Id.* ¶ 32.

[127] AAP Letter, *supra* n. 105, at 3.

[128] DG Comp Decision, *supra* n. 14, ¶ 123; *see also id.* ¶ 129 ("[W]here Retail Price Parity Provisions are in place, E-book Retailers' incentives to compete on commission are limited. This is because when charging a lower rate of commission, a competing E-book Retailer can no longer expect that E-book Suppliers will respond by lowering selectively the retail prices of its e-books on that E-book Retailer's platform. This is because when bound by Retail Price Parity Provisions of Amazon, a lower retail price set by an E-book Supplier on one E-book Retailer's platform

106.    The Retail Price Parity Provisions have multiple anticompetitive effects. Since Alternative Platforms are incapable of competing by offering lower commissions, "Amazon has the incentive to charge higher rates of commission," which are "likely to be passed on to consumers in the form of higher e-book prices."[129] The Retail Price Parity Provisions thus cause Plaintiffs and Class members to pay higher prices.

107.    The provisions also enabled Amazon to acquire and maintain monopoly power. If these provisions did not exist, the Big Five would have a financial incentive to agree to Alternative Platforms' lower commission rates, thus increasing sales, increasing overall revenues and profits and evading Amazon's stranglehold over them.[130] Relatedly, Alternative Platforms would have incentives to try and increase their market share.[131] Instead, Amazon and the Big Five's implementation of these provisions diminishes those incentives and harms competition.

### 3.    Selection Parity Provisions

108.    Another way an Alternative Platform may differentiate itself from Amazon, and thus compete for some of its market share, is by offering a broader or different selection, such as titles that are exclusive to the Alternative Platform or are released there early, or titles containing enhanced features such as illustrations, animations, interactive elements, or author interviews.

109.    In its agency agreements, Amazon requires the Big Five to agree to three different types of "Selection Parity Provisions" that prohibit any such differentiation.

---

would need to be matched by an equally low price on Amazon as well. Hence, a competing E-book Retailer can no longer expect to attract customers from Amazon by offering lower rates of commission to E-book Suppliers.")

[129] DG Comp Decision, *supra* n. 14, ¶ 130, 131.

[130] *Id.* at 34; House Report, *supra* n.6, at 295.

[131] DG Comp Decision, *supra* n. 14, ¶ 121.

110.    **Catalogue Parity Clauses** require that any eBook available on an Alternative Platform must also be available on Amazon.[132]

111.    **Availability Date Parity Clauses** require that any eBook available on an Alternative Platform must be available on Amazon at *the same time* it is available on the other platform.[133] Thus, a Big Five publisher cannot make a newly released eBook available exclusively on any Alternative Platform for *any* period of time before it is also available on Amazon.

112.    **Features Parity Clauses** address the situation in which a publisher may collaborate with an Alternative Platform to develop an eBook containing enhanced features. The Features Parity Clause requires that the publisher must provide comparable content for Amazon devices and, for those Amazon devices that do not support the additional features, a version that is compatible with those devices.

113.    As the DG Comp explained, the Selection Parity Provisions reduce the incentives of publishers and Alternative Platforms "to develop e-books which are not primarily text and preventing the differentiation of [Alternative Platforms] through, for example, innovative features or functionalities of e-books."[134] The global requirement of compatibility with Amazon's eBook readers—some of which are not capable of supporting such enhanced content—effectively eliminates any economic incentive the Big Five have to develop innovative eBooks that might be read on a more technologically advanced platform.[135] The Selection Parity

---

[132] *Id.* ¶ 91.

[133] *Id.* ¶ 91.

[134] *Id.* ¶ 92.

[135] *Id.* ¶ 110 (explaining that because the publishers cannot generate content exclusively for Alternative Platform, those Alternative Platforms "may also have reduced incentives to invest in developing e-books or new editions," particularly if the publishers "will be forced to provide such content also to Amazon").

Provisions "limit competing E-book Retailers' scope to differentiate on the basis of content," distinct offerings or early releases.[136] The Selection Parity Provisions reduce the incentive for Alternative Platforms to "invest in the development of highly illustrated or enhanced e-books" as they would be less likely to "reap benefits from such investments" if they cannot offer them exclusively.[137]

114.   The Selection Parity Provisions also reduce the incentive for Alternative Platforms to invest in non-price promotions such as early release dates or books exclusively available on their platforms, since Amazon will end up having the same titles available on the same day.[138] Publishers would have an incentive to participate in such efforts in order to increase the Alternative Platforms' market share and weaken Amazon's bargaining power over the Big Five.[139] But they sacrifice that self-interest as part of a coordinated effort to support each other's prices and further Amazon's monopoly.

115.   Amazon's Selection Parity Provisions hurt consumers by inducing publishers to keep their eBook functionalities simple, which eliminates the more interactive and advanced functions that might otherwise be available on the Alternative Platforms.[140] The result is "[r]educed competition at the e-book distribution level" and, in turn, "higher prices and less choice for consumers."[141] Such clauses harm competition because they foreclose a significant avenue for Alternative Platforms to compete with Amazon by differentiating the product or

---

[136] *Id.* ¶ 106-07.

[137] *Id.* ¶ 103.

[138] *Id.* ¶ 110 ("[N]ot being able to exclusively offer early release dates may undermine competing E-book Retailers' incentives to invest in such non-price related promotional activities, since Amazon may have the same titles on the same date.").

[139] *Id.* at 29-30.

[140] *Id.* ¶ 107.

[141] *Id.* ¶ 104.

making it available earlier.[142] Thus, the provisions also enable Amazon to maintain its monopoly power.

116.    If the Selection Parity Provisions did not exist, publishers would have a financial incentive to develop exclusive titles with Alternative Platforms, early release dates with Alternative Platforms, or more innovative products with Alternative Platforms. Relatedly, Alternative Platforms would have incentives to invest in such efforts in an attempt to increase their market share. Instead, Amazon and the Big Five's implementation of these provisions diminishes those incentives and harms competition.

### 4.    Business Model Parity Provisions

117.    Yet another way that an Alternative Platform may differentiate itself from Amazon is by offering an innovative model for distribution of eBooks to consumers.[143] Such models might include bundled pricing for print and eBook versions of a book; a pay-as-you-read model that enables readers to purchase only part of a book; rental models that enable readers to license a book on a temporary basis; or smartphone apps that give access to classic books.[144]

118.    Amazon deploys "Business Model Parity Provisions" in its contracts with the Big Five publishers that nip this competition in the bud.

119.    Under a Business Model Parity Provision, a publisher is obliged to notify Amazon if any Alternative Platform develops an alternative business model, to share with Amazon the details of that business model, and to grant Amazon the right to sell eBooks according to that same model.[145]

---

[142] *Id.* at 31.

[143] *Id.* ¶ 84, 89.

[144] *Id.* ¶ 79.

[145] *Id.* ¶ 74.

120.     Such clauses are anticompetitive because they reduce the ability and incentive for both Alternative Platforms and the Big Five alike to support and invest in innovative business models that might create benefits for consumers, including but not limited to lower prices. The clauses reduce the incentive for the Big Five to explore innovative business models on a small or trial scale, since they would be compelled to allow Amazon to deploy the model on a larger scale.[146] They also eliminate any ability one of the Big Five might have to support an Alternative Platform by exploring such alternative business models,[147] even though that would potentially increase the strength of Alternative Platforms, "reduce [publishers'] dependence on Amazon, improve their bargaining position and help them reduce the compensation that they need to concede to Amazon."[148] Consequently, the reluctance of *publishers* to explore such business models effectively moots any interest that an Alternative Platform might have in doing so.[149] Amazon's power to free-ride on any alternative business model it develops—after the Alternative Platform has already taken on the cost and risk of developing it, introducing it, and marketing it to the public—diminishes the incentive for an Alternative Platform to develop one in the first place.[150]

121.     The result of these anticompetitive effects is that Alternative Platforms are unable to differentiate themselves from Amazon and unable to compete for market share or expand. New entrants are likewise discouraged from entering the market. The Business Model Parity

---

[146] *Id.* ¶ 82(1).

[147] *Id.* ¶ 82(2).

[148] *Id.* ¶ 81(2).

[149] *Id.* ¶ 85(1).

[150] *Id.* ¶ 85(3).

Provisions enable Amazon to acquire and maintain monopoly power, resulting in higher prices and less choice for consumers.

### 5. Amazon's Other Anticompetitive Practices Also Raise eBook Prices

122. Amazon increases the cost of selling eBooks in other ways, including by tying its distribution services—*i.e.*, helping customers find and purchase eBooks on the Amazon platform, collect payment, and deliver the book electronically—with its advertising services, which are designed to maximize the placement of advertisements to consumers at various points of the search and purchase experience.[151] Amazon drives up the Big Five's cost of doing business on Amazon by manipulating the "discovery tools to make a publisher's books difficult to find without the purchase of advertising or refuses distribution unless the publisher also purchases advertising."[152]

123. Amazon also benefits from the high prices to which it subjects the Big Five's eBooks because, as a publisher itself, Amazon faces less price competition for its own titles. Peter Hildick-Smith, CEO of the book-industry analysis firm the Codex Group, estimates that Amazon Publishing puts out 1,100 titles a year.[153] Estimating sales for those 1,100 titles is difficult because Amazon's proprietary methods of distribution obscure the sales figures from the third-party researchers who determine best-seller lists.[154] Amazon cryptically reveals only that at least 36 of its authors have sold at least a million books.[155] Best-selling author Dean Koontz has

---

[151] *Id.*

[152] *Id.*

[153] Blake Montgomery, *The Amazon Publishing Juggernaut*, The Atlantic (Aug. 8, 2019), https://www.theatlantic.com/technology/archive/2019/08/amazons-plan-take-over-world-publishing/595630/.

[154] *Id.*

[155] *About Us*, Amazon Publishing, https://amazonpublishing.amazon.com/about-us.html (last visited Feb. 11, 2021).

a five-book deal with Amazon Publishing.[156] One imprint, Amazon Crossing, is the largest publisher of translated fiction in the United States.[157] Two books published by Amazon Publishing have won literary awards and hundreds of others have been nominated.[158] Amazon currently operates 16 imprints (*i.e.*, publishing labels) and has nine offices around the world.[159]

124.    Amazon and the Big Five have been looking to stem competition not only from the Alternative Platforms, but also from another source: libraries. The Big Five have grown increasingly reluctant to license their eBook titles to libraries, or to do so at inflated prices[160] or only months after a book's release for purchase, out of concern that library lending cannibalizes sales.[161] In its role as a publisher itself, Amazon has *never* allowed its eBook titles to be available at libraries, though it is facing increasing pressure to do so.[162] Rather than lend to libraries on reasonable terms, Amazon and the Big Five conspire to make their products available on fewer platforms, and at higher prices, in the hopes of making more on the shrinking quantities of eBooks they do sell.

---

[156] Jeffrey A. Trachtenberg, *Amazon Publishes Books by Top Authors, and Rivals Fret*, Wall Street Journal (Jan. 14, 2020) https://www.wsj.com/articles/amazon-publishes-books-by-top-authors-and-rivals-fret-11578997802.

[157] Allison Flood, *How Amazon Came to Dominate Fiction in Translation*, The Guardian (Dec. 9, 2015), https://www.theguardian.com/books/2015/dec/09/amazon-publishing-translated-fiction-amazoncrossing-sales.

[158] *About Us*, Amazon Publishing, *supra* note 155.

[159] *Id.*

[160] Bill Rosenblatt, *Libraries Take E-Book Lending Fight Into Antitrust Territory*, Copyright and Technology (Oct. 26, 2019), https://copyrightandtechnology.com/2019/10/26/libraries-take-e-book-lending-fight-into-antitrust-territory/.

[161] Gabrielle Emanuel, *Inside the E-Book 'War' Waging Between Libraries and Publishers*, WGBH (Jan. 6, 2020), https://www.wgbh.org/news/local-news/2020/01/06/inside-the-e-book-war-waging-between-libraries-and-publishers.

[162] Rebecca Klar, *Amazon Under Pressure to Lift Ban on e-Book Library Sales*, The Hill (Dec. 2, 2020), https://thehill.com/business-a-lobbying/528280-amazon-under-pressure-to-lift-ban-on-e-book-library-sales.

## VI.    CLASS ACTION ALLEGATIONS

125.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal antitrust law on behalf of the members of the following Class:

> All persons who, on or after February 11, 2017, purchased in the United States one or more eBooks sold by the Big Five Publishers through any retailer other than Amazon.

126.    Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

127.    **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of hundreds of thousands, if not millions, of individuals.

128.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class. The claims of Plaintiffs and the members of the Class arise from the same conduct by Defendants and are based on the same legal theories..

129.    **Adequate representation:** Plaintiffs will represent and protect the interests of the Class both fairly and adequately. They have retained counsel competent and experienced in complex class action litigation. Plaintiffs have no interests that are antagonistic to those of the Class, and their interests do not conflict with the interests of the Class members they seek to represent.

130.    **Predominant Common Questions:** Questions of law and fact common to the Class predominate over questions that may affect only individual Class members because

Defendant has acted on grounds generally applicable to the Class and because Class members

share a common injury. Thus, determining damages with respect to the Class as a whole is

appropriate. Common questions include, but are not limited to, the following:

i. Whether Defendants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to the MFNs and similar provisions described herein;

ii. Whether Defendant Amazon has unlawfully monopolized the U.S. retail eBook market by way of the conduct and practices described herein;

iii. Whether Defendants' conduct harmed competition in the Relevant Market;

iv. Whether Plaintiffs and Class members have been damaged by Defendants' conduct;

v. The total amount of damages suffered by the Class; and

vi. The nature and scope of injunctive relief necessary to restore a competitive market.

131.    **Injunctive relief:** By way of its conduct described in this complaint, Defendants

have acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive

relief is appropriate respecting the Class as a whole. Because the conduct is ongoing, remedies at

law are inadequate to fully redress the injury to Plaintiffs and the Class.

132.    **Predominance and superiority:** This proposed class action is appropriate for

certification. The common applicability of the relevant facts to claims of Plaintiffs and the Class

are inherent in Defendants' wrongful conduct because the overcharge injuries incurred by

Plaintiffs and each member of the Class arose from the same anticompetitive conduct alleged

herein. Class proceedings on these facts and this law are superior to all other available methods

for the fair and efficient adjudication of this controversy, given that joinder of all members is

impracticable. Even if members of the Class could sustain individual litigation, that course

would not be preferable to a class action because individual litigation would increase the delay

and expense to the parties due to the complex factual and legal controversies present in this matter, and present the risk of inconsistent or varying results. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VII.   ANTITRUST INJURY

133.   Defendants, through their unlawful conduct alleged herein, increase the prices of eBooks offered through competing retail channels, reduce consumer choices, and cause antitrust injury to retail eBook purchasers in the form of overcharges. Plaintiffs and Class members have sustained, and continue to sustain, significant losses from overcharges directly caused by Defendants' anticompetitive activity. Plaintiffs will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiffs and Class members will incur future overcharges in their direct purchases of the Big Five's eBooks.

134.   Defendants' conduct caused harm to all or nearly all members of the Class, in the form of overcharges and reduced choice.

135.   As required by the MFNs and similar provisions, when the Publisher Defendants sell their eBooks through Alternative Platforms via an agency model (or, in the case of Defendant HarperCollins, through its own website as well), they sell at a retail price that is equal to or higher than the price at which they sell their eBooks via Amazon. It is in the Publisher Defendants' economic self-interest to expand their retail sales of their eBooks and diversify their distribution. They stated as much in their letter to Congress.[163] It would serve this interest to

---

[163] AAP letter, *supra* n. 105, at 2.

allow Alternative Platforms to develop alternative business models that cost less to consumers but increase the Publisher Defendants' revenue. Offering Alternative Platforms exclusives, temporary exclusives, or special edition or enhanced eBooks would also attract new customers, increase sales, and reduce the Publisher Defendants' dependency on Amazon. Similarly, avoiding the commissions charged by Amazon and selling through their own websites at a greater discount, or allowing Alternative Platforms to add their own discounts and promotions to steer more sales to their platforms, would also serve the Publisher Defendants' economic self-interest.

136.    But Amazon and the Publisher Defendants' agreed to act against the Publisher Defendants' self-interest so as to preserve Amazon's monopoly and supracompetitive prices for eBooks.

137.    Plaintiffs and class members who purchase directly from the Publisher Defendants through the Alternative Platforms are harmed because they pay prices that are anticompetitively increased by Amazon and the Publisher Defendants without the benefit of discounts, promotions, and potentially lower-cost alternative business models that would exist in a competitive market, where the restraints described above do not exist.

138.    Because Defendant Amazon continues to enforce its anticompetitive MFN and similar restrictive provisions, Plaintiffs and Class members are reasonably likely to incur future overcharges for the Big Five's eBooks. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of antitrust laws, including its anticompetitive agreement with the Publisher Defendants and its monopolization of the eBooks market, as alleged herein. Because the harm is ongoing, remedies at law are inadequate to redress the harm suffered and injunctive relief is necessary.

139.    The MFNs in Amazon's agency agreements with the Publisher Defendants' facilitate anticompetitive horizontal coordination among the Publisher Defendants by reducing each company's incentive to deviate from their coordinated horizontal arrangement.

## VIII.   CAUSES OF ACTION

**COUNT ONE**
**Restraint of Trade**
(Violation of Section 1 of the Sherman Act, 15 U.S.C. §1)

140.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

141.    Plaintiffs bring this claim on behalf of themselves and the Class. Plaintiffs seek damages and injunctive relief.

142.    Plaintiffs and the Class assert no claims against Defendants relating in any way to any products or services sold by or distributed through Amazon.

143.    The Relevant Market is the U.S. retail market for trade eBooks.

144.    In violation of Section 1 of the Sherman Antitrust Act, Defendants agreed to various anticompetitive MFNs and other anticompetitive provisions that had the same intent and effect as the MFNs, including the Notification Provisions, Retail Price Parity Provisions, Selection Parity Provisions, and Business Model Parity Provisions described above.

145.    These provisions have an adverse effect on competition. They ensure that Amazon faces no competition in the price or availability of trade eBooks, no competition from other competing business models—*e.g.*, rentals, bundling with physical books or book clubs, or partial downloads—and no competition from retailers that support enhanced eBooks that have features not supported by Amazon's Kindle readers. By preventing Alternative Platforms from introducing better pricing, alternative business models or unique products, Defendants increase

the prices that Plaintiffs and Class members pay and reduce the choices Plaintiffs and Class members have.

146.    Defendants' anticompetitive agreements have actual detrimental effects, *i.e.*, less competitive pricing and greater product conformity.

147.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets.

148.    Defendants did not act unilaterally or independently, or in their own economic interests, when entering into these agreements, which substantially, unreasonably, and unduly restrain trade in the Relevant Market, and harmed Plaintiffs and the Class thereby. Rather, each acted against its own self-interest. For example, the Publisher Defendants acted against their own self-interest by agreeing to agency agreements with Amazon that contained the MFNs and similar provisions, since those agreements and provisions caused them to lose revenue.

149.    Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints regardless of whether a per se, "quick look" or rule of reason standard applies.

150.    The Publisher Defendants had opportunities to conspire, as the senior executives for each of the publishers meet on a quarterly basis without lawyers present, as well as through trade associations such as the AAP.

151.    The Publisher Defendants possess a common motive to conspire, since each stood to benefit if they all entered agreements with Amazon on similar terms.

152.    The Relevant Market is conducive to anticompetitive conduct because it has high barriers to entry.

153.    Because Defendant Amazon controls as much as 80% of the retail market for trade eBooks in the United States, Amazon possesses market power in the Relevant Market. That Defendant Amazon possesses market power is also evident from its power to raise trade eBook prices above that which would be charged in a competitive market. Because the Publisher Defendants control as much as 80% of the retail market for trade books in the United States, the Publisher Defendants possess market power in the Relevant Market.

154.    There is no legitimate, pro-competitive business justification for the MFNs and similar provisions in Defendants' agreements. Even if there were such a justification for those provisions, the anticompetitive effects outweigh the procompetitive effects. Even if there were a valid business purpose for those provisions, the agreements and provisions are broader than necessary to achieve such a purpose.

155.    Plaintiffs and members of the Class have been injured and will continue to be injured in their businesses and property by paying more for the Publisher Defendants' eBooks from Alternative Platforms than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and to recover three times the amount of their overcharge damages directly caused by Defendants' unreasonable restraints of trade.

**COUNT TWO**
**Monopolization**
(Violation of Section 2 of the Sherman Act, 15 U.S.C. §2)

156.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

157.    Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class described above. Plaintiffs seek damages and injunctive relief.

158.    Plaintiffs and the Class assert no claims against Defendants relating in any way to any products or services sold by or distributed through Amazon.

159.    The Relevant Market is the U.S. retail market for trade eBooks.

160.    Defendant Amazon possesses market power in the Relevant Market, where it controls about 80% of trade eBook sales. That Defendant Amazon possesses market power is also evident from its power to raise trade eBook prices above that which would be charged in a competitive market.

161.    Through its conspiracy with the Publisher Defendants, Amazon has willfully acquired and maintained its monopoly power in the Relevant Market by unlawful and improper means, including preventing Alternative Platforms from gaining market share and dissuading potential rivals from entering the market. Defendant entered into anticompetitive agreements with the Publisher Defendants with the intent and effect of 1) ensuring that the Publisher Defendants' eBooks sold by or through Amazon's eBook retailer rivals were sold at prices at least as high as the prices on Amazon.com; 2) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; 3) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, book rentals and partial downloads; and 4) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations, animation and interactivity.

162.    Plaintiffs and members of the Class are direct purchasers because they directly purchase eBooks from the Publisher Defendants through eBook retailers other than Amazon.

163.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for the Publisher Defendants' eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

164.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and to recover three times the amount of their overcharge damages directly caused by Defendant Amazon's monopolization.

### COUNT THREE
**Conspiracy to Monopolize**
(Violation of Section 2 of the Sherman Act, 15 U.S.C. §2)

165.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

166.    Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class described above. Plaintiffs seek damages and injunctive relief.

167.    Plaintiffs and the Class assert no claims against Defendants relating in any way to any products or services sold by or distributed through Amazon.

168.    The Relevant Market is the U.S. retail market for trade eBooks.

169.    Defendant Amazon possesses market power in the Relevant Market, where it controls about 80% of trade eBook sales. That Defendant Amazon possesses market power is also evident from its power to raise trade eBook prices above that which would be charged in a competitive market. Because the Publisher Defendants control as much as 80% of the retail market for trade books in the United States, the Publisher Defendants possess market power in the Relevant Market.

170.    Amazon and the Publisher Defendants have conspired together to confer on Amazon a monopoly in the Relevant Market.

171.    Defendants have taken overt acts in furtherance of that conspiracy, including by entering the agency agreements and agreeing to the MFNs and similar provisions discussed herein.

172.    Defendants have a specific intent to monopolize the Relevant Market. Defendants entered the anticompetitive agreements with the intent and effect of 1) ensuring that the Publisher Defendants' eBooks sold by or through Amazon's eBook retailer rivals were sold at prices at least as high as the prices on Amazon.com; 2) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; 3) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, book rentals and partial downloads; and 4) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations, animation and interactivity.

173.    Plaintiffs and members of the Class are direct purchasers because they directly purchase eBooks from the Publisher Defendants through eBook retailers other than Amazon.

174.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for the Publisher Defendants' eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

175.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and to recover three times the amount of their overcharge damages directly caused by Defendants' conspiracy to monopolize.

## JURY TRIAL DEMANDED

176.    Plaintiffs hereby demand a trial by jury for all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.      Finding that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and directing that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      Finding that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Finding that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Awarding Plaintiffs damages, penalties and other monetary relief provided by applicable law, including treble damages, and pre-judgment and post-judgment interest;

E.      Awarding Plaintiffs equitable relief, including injunctive, declaratory and other equitable relief, pursuant to 15 U.S.C. § 26;

F.      The costs of bringing this suit, including reasonable attorneys' fees; and

G.      Such other relief as the Court deems just and proper.

Dated: New York, New York
        February 11, 2021

By:  /s/ Kellie Lerner
Kellie Lerner, Bar No. (4446472)
Meegan Hollywood
David Rochelson
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone:     (212) 980-7400
Facsimile:     (212) 980-7499
klerner@robinskaplan.com
mhollywood@robinskaplan.com
drochelson@robinskaplan.com

Adam Frankel
**GREENWICH LEGAL ASSOCIATES LLC**
881 Lake Avenue
Greenwich, CT 06831
Telephone:     (203) 622-6001
afrankel@grwlegal.com

*Attorneys for Plaintiffs and the Proposed Class*